# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, <u>EX REL.</u><br>ROBERT A. CUTLER<br><br>          Plaintiff,<br><br>          v.<br><br>CIGNA CORP., CIGNA HOLDINGS, INC.,<br>CONNECTICUT GENERAL CORP.,<br>HEALTHSPRING, INC., NEW QUEST LLC,<br>HEALTHSPRING LIFE & HEALTH<br>INSURANCE COMPANY, INC.,<br>GULF QUEST LP and HOME PHYSICIANS<br>MANAGEMENT LLC<br><br>          Defendants. | Civil Action No.:<br><br>**COMPLAINT FOR VIOLATION<br>OF FALSE CLAIMS ACT,<br>31 U.S.C. § 3729 <u>ET SEQ.</u>**<br><br>**FILED IN CAMERA AND<br>UNDER SEAL PURSUANT TO<br>31 U.S.C. § 3730(b)(2)**<br><br>**JURY TRIAL DEMANDED** |

For its complaint, the United States of America *ex. rel.* Robert A. Cutler (the "United States"), alleges as follows:

## NATURE OF THE ACTION

1.  This is an action to recover damages and civil penalties on behalf of the United States under the Federal False Claims Act, 31 U.S.C. §§ 3729-33, against Cigna Corp. ("Cigna"), Cigna Holdings, Inc. ("Cigna Holdings"), Connecticut General Corp. ("CGC"), HealthSpring, Inc. ("HealthSpring Parent"), New Quest LLC ("New Quest"), HealthSpring Life & Health Insurance Company, Inc. ("HLHI"), Gulf Quest LP ("Gulf Quest"), and Home Physicians Management, LLC ("Alegis"). These entities are collectively referred to hereinafter as "Defendants" or "Cigna-HealthSpring."

2.     This action is being brought as a result of false and fraudulent risk adjustment claims that were submitted to The Centers for Medicare & Medicaid Services ("CMS") by Cigna-HealthSpring between 2012 and 2017 using improper diagnostic codes under the International Classification of Diseases, Clinical Modification system ("ICD Codes"). These ICD Codes referred to health conditions of Medicare beneficiaries that (1) did not exist, (2) were not recorded in any medical records and (3) were not based on clinically reliable information. Cigna-HealthSpring intentionally mispresented these health conditions as part of a widespread scheme to coax CMS into paying a higher monthly capitated rate on behalf of Medicare beneficiaries enrolled in Cigna-HealthSpring's Medicare Advantage plans (the "MA Plans"). CMS, unaware that these claims were false and fraudulent and relying on the faulty ICD codes, overpaid Cigna-HealthSpring by more than $1.4 billion.

## PARTIES

3.     Defendant Cigna is a Delaware corporation with its principal place of business located at 900 Cottage Grove Rd., Bloomfield, Connecticut. Cigna through its subsidiaries is one of the largest health services organizations in the United States. Based on its 2016 Annual Report filed with the U.S. Securities and Exchange Commission, in 2016 Cigna earned approximately $39.7 billion in total revenue and it had approximately $56.4 billion in assets at December 31, 2016.

4.     Defendant Cigna Holdings is a Delaware corporation and wholly-owned subsidiary of Cigna with its principal place of business located at 900 Cottage Grove Rd., Bloomfield, Connecticut. On information and belief Cigna Holdings is a holding company that through its direct and indirect wholly-owned subsidiaries owns and controls all of Cigna's assets in the United States.

2

5.     Defendant CGC is a Connecticut corporation and wholly-owned subsidiary of Cigna Holdings with its principal place of business located at 900 Cottage Grove Rd., Bloomfield, Connecticut. On information and belief, CGC is a holding company of numerous direct and indirect wholly-owned subsidiaries that engage in a range of insurance and insurance-related businesses within the United States.

6.     Defendant HealthSpring Parent is a Delaware corporation and wholly-owned subsidiary of CGC with its principal place of business located at 9009 Carothers Pkwy, Building B, Suite 501, Franklin, Tennessee 37067. On information and belief, HealthSpring Parent is the parent company of all of the entities that collectively comprise the business known as "HealthSpring." The HealthSpring business has been a part of the CGC ownership structure since 2012 when it was acquired by CGC for $3.8 billion.

7.     Defendant New Quest is a Texas corporation and wholly-owned subsidiary of HealthSpring Parent with its principal place of business located at 44 Vantage Way, Suite 300, Nashville, Tennessee.  On information and belief New Quest is the owner and manager of several direct and indirect wholly-owned subsidiaries that operate Medicare Advantage plans ("MA Plans") and health maintenance organizations within the United States, and engage in other insurance-related businesses.  The Medicare Advantage plans operated by New Quest's subsidiaries provide health insurance to more than 300,000 Medicare beneficiaries nationwide.

8.     Defendant HLHI is a Texas corporation and wholly-owned subsidiary of New Quest with its principal place of business located at 2900 North Loop W, Suite 1300, Houston Texas. HealthSpring Insurance operates the MA Plans which provide health insurance coverage to Medicare beneficiaries in 13 states nationwide.

3

9.     Defendant Alegis is an Illinois limited liability company and wholly-owned subsidiary of New Quest with its principal place of business located at 1340 South Damen Avenue, Suite 210, Chicago, Illinois.  Alegis provides healthcare services to Medicare beneficiaries enrolled in the MA Plans, including chronic care management services and health assessments.

10.     Defendant Gulf Quest is a Texas limited partnership and subsidiary of New Quest with its principal place of business located at 2900 North Loop W, Suite 1300, Houston, Texas. On information and belief Gulf Quest provides management services to HLHI.

11.     Relator is a United States citizen residing in the State of Connecticut and an officer of Texas Health Management LLC ("THM"), a Texas limited liability company.  THM was a service provider of Cigna-HealthSpring between 2012 and 2017. Relator's knowledge of the matters giving rise to this action stem from his position as an officer and beneficial owner of equity in THM.

12.     The United States, on whose behalf Relator brings this action, is the real party in interest with respect to the claims asserted herein.  The United States through its agency CMS has ongoing contracts with Cigna-HealthSpring as a Medicare Advantage Organization that participates in the Medicare and Medicaid programs.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C §§ 3729 and 3730.

14.     There have been no public disclosures of the allegations or transactions contained herein that bar jurisdiction under 31 U.S.C § 3730(e).

4

15.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C §
3732(a) because that section authorizes nationwide service of process and because Defendants
have at least minimum contacts with the United States, and can be found in, reside, or transact or
have transacted, business in the Southern District of New York.

16.     Venue exists in the United States District Court for the Southern District of New
York pursuant to 31 U.S.C §§ 3732(a) and 3730(b)(1) because all of the Defendants have at least
minimum contacts with the United States, and one or more of the Defendants can be found in,
reside, or transact or have transacted business in the Southern District of New York.  Among
other things, (1) Cigna-HealthSpring maintains the following offices within the Southern District
of New York: (A) 50 Main Street, 9th Floor, White Plains, New York, (B) 140 E. 45th Street,
New York, New York and (C) 14 Wall Street, New York, New York, (2) Cigna-HealthSpring
markets and sells health insurance products within Westchester and New York counties within
the State of New York, including Medicare plans such as the Cigna-HealthSpring Rx Secure
Plan and the Cigna-HealthSpring Rx Secure-Extra Plan, (3) Cigna-HealthSpring network
providers operate businesses within Westchester and New York Counties within the State of
New York, (4) Cigna-HealthSpring is an approved provider of Medicare Advantage plans to
New York City former employee retirees and these plans are advertised on the New York City
government web site and (5) Cigna-HealthSpring is a publicly-traded company whose common
stock is traded on the New York Stock Exchange.

## BACKGROUND

### The Medicare Advantage Program

17.     CMS administers a program known as "Medicare," which provides health
insurance coverage to several types of individuals, including those who are (1) at least 65 years

of age, (2) under age 65 with certain disabilities and (3) of any age with End-Stage Renal Disease.

18.　　The benefits afforded by the Medicare program are divided into four segments: (1) Medicare Part A, which covers certain medically necessary services, such as inpatient hospital stays, care in skilled nursing facilities, hospice care and certain home health care, (2) Medicare Part B, which covers certain preventative care, such as outpatient care, medical supplies and services necessary to treat or prevent a medical condition, clinical research and ambulance services, (3) Medicare Part C, which covers benefits for beneficiaries enrolled in private health insurance plans, including all of the benefits of Medicare Parts A and B, and (4) Medicare Part D, which covers prescription drug costs.

19.　　Eligible individuals can participate in the Medicare program by enrolling in traditional Medicare, which is managed directly by the federal government, or in a MA Plan established under Medicare Part C which is managed by a private health insurer ("MA Organization"). Medicare Advantage plans are required to offer the same benefits to Medicare beneficiaries enrolled in the plan ("Plan Members") as they would be entitled to receive under traditional Medicare.

20.　　Traditional Medicare and Medicare Advantage plans are both subsidized with funding from the federal government but they pay the beneficiary's healthcare costs in different ways. Under traditional Medicare, CMS pays healthcare providers for the services they render on a fee-for-service basis. The fees are determined by rates set forth in a set of fee schedules that CMS updates on an annual basis. Providers submit a claim to CMS for each service they render and CMS pays the provider based on the applicable rate.

6

21.     Under Medicare Advantage, CMS does not pay healthcare costs directly but rather pays the MA Organization a flat "capitated rate" each month and the MA Organization in turn pays the providers for the services they render.  MA Organizations are not required to follow the fee-for-service model and generally speaking may structure their payment arrangements with providers as they see fit.

22.     The capitated rate that CMS pays to a MA Organization is an amount determined on a per-beneficiary per-month basis using a "risk adjustment" model which weighs the relative financial risks of each beneficiary enrolled in the MA Plan based on his or her health status. This model was designed by CMS in recognition of the fact that the health status of Medicare beneficiaries vary significantly.  See Section 2.1 of *Evaluation of the CMS-HCC Risk Adjustment Model Final Report*, dated March 2011, prepared by RTI International for CMS.  CMS reasoned that unless monthly payments were adjusted to take into account the financial risks entailed by enrolling beneficiaries with the most serious and costly health conditions, MA Organizations would seek to enroll only those beneficiaries who were in good health and were likely to incur minimal healthcare costs. Id.  The risk adjustment model attempts to compensate MA Organizations for these variations in financial risk.

23.     To calculate the per-beneficiary per-month amount under the risk adjustment model, CMS first assigns a "risk score" to each Plan Member based on that Plan Member's relative health status.  CMS obtains information concerning each Plan Member's health status from several sources, most important among them being the MA Organization itself, which reports to CMS health data concerning the Plan Members.  The data is required to be reported in the form of ICD Codes that describe the relevant health conditions.  The MA Organization

obtains this data from the Plan Members' healthcare providers who are required to report to the MA Organization diagnoses they render during a patient encounter.

24. CMS organizes the ICD Codes data into separate groups of clinically related health conditions ("HCCs") that have similar cost implications. HCCs are each assigned a numerical value. The more serious and costly that a particular HCC is to monitor and treat, the higher the value that will be assigned to that health condition. Chronic health conditions such as diabetes are assigned higher values while generic health conditions are assigned low values or no values at all.

25. These values are added together to arrive at an overall risk score for the Plan Member. This number represents the Plan Member's financial risk to the MA Plan relative to a hypothetical "average" beneficiary within the plan (the "Average Beneficiary"). For the Average Beneficiary, the overall risk score is 1.0 and CMS assigns a per-beneficiary per-month base rate each year that would correspond to this risk score (the "Base Rate").

26. If a Plan Member has a risk score that is higher or lower than the Average Beneficiary risk score of 1.0, then the monthly amount associated with that Plan Member will be adjusted upwards or downwards proportionally. For example if a Plan Member's risk score is 1.2, the monthly amount will be 20% higher than the Base Rate. Conversely if a Plan Member's risk score is 0.80, the monthly amount will be 20% lower than the Base Rate.

27. Adjustments are made to each beneficiary's risk score annually based on the ICD codes submitted to CMS by the MA Organizations. These adjustments are prospective in the sense that ICD codes for patient encounters in a given year is used to predict the costs and adjust the monthly payment for the following year.

## The 360 Program

28.     In 2012 Cigna-HealthSpring initiated a program known as the "360 Program." This program was designed to engage primary care providers in the Cigna-HealthSpring network ("PCPs") to perform a type of health assessment for the Plan Members which Cigna-HealthSpring refers to as a "360."

29.     A 360 is an "enhanced" version of an annual wellness visit ("AWV"). An AWV is a Medicare benefit which entitles a beneficiary to an annual face-to-face encounter with a health professional that includes the following services:

       (1) review (and administration, if needed) of an updated health risk assessment;

       (2) update to the patient's medical and family history;

       (3) update to the list of current providers and suppliers involved in the patient's medical care;

       (4) Measurement of patient's weight (or waist circumference), blood pressure and other routine measurements as deemed appropriate;

       (5) Detection of cognitive impairment;

       (6) update to the patient's written screening checklist and a list of risk factors with intervention and recommendations;

       (7) furnish personalized health advice and a referral, as appropriate, to health education or preventative counseling services or programs; and

       (8) Discretionary advance care planning services that may be requested by the patient;

See 42 CFR 410.15. The 360 goes beyond the scope of the AWV in that it also includes a routine physical exam.

9

30.     Senior executives at Cigna-HealthSpring pitched the 360 to PCPs as a means for closing "gaps in care." They pointed out that these gaps existed because many Plan Members were not visiting their PCPs for an annual physical exam due to the fact that Medicare would not cover the cost. As a result, they claimed that serious health conditions were not being detected and that by performing the 360s PCPs would be able to diagnose and treat these health conditions and therefore improve the quality of care.

31.     Even though Cigna-HealthSpring pitched the 360 in this manner, quality of care was not the underlying purpose of the 360 Program. The program centered on a business model devised by Cigna-HealthSpring in which the 360 would be used to find health conditions that could raise the risk scores of the Plan Members and therefore increase the monthly capitated payments that CMS paid to Cigna-HealthSpring.

### The 360 Form

32.     In order to achieve the goal of raising risk scores, senior executives within Cigna-HealthSpring engineered a system of targeting Plan Members who were most likely to have with the highest potential for risk score and revenue increases. Analysts working within Cigna's affiliate Gulf Quest utilized a data-mining tool known as Predilytics to search the medical histories of all of the Plan Members and then organize the Plan Members into different priority categories. These categories were labeled "critical," "high," "moderate," "low" and "very low." Members with chronic diseases and Plan Members who had never received a 360 exam were assigned the highest priorities.

33.     Senior executives at Cigna-HealthSpring also engineered a system for performing the 360 that would capture as many diagnoses as possible. The principal contributor to the development of this system was Dr. Michael Fessenden, the Medical Director of the 360

program. Dr. Fessenden designed or improved on a check-the-box form known as a "360 Comprehensive Assessment" (the "360 Form") which providers were required to complete in order to document each 360 encounter. The 360 Form was "comprehensive" in the sense that it reflected health profile of all biological systems based on the totality of the information obtained during the AWV and physical exam portions of the 360. That is to say the 360 Form combined in a single document information that would typically be collected in the course of an AWV ("Collected Health Information"), such as a list of medications, the patient's medical history and a self-assessment of health status, as well as information that would typically be obtained in the course of performing a routine physical examine ("Clinical Data"), such as heart rate, blood pressure and observable health problems.

34.    However, in doing this the 360 Form made no distinction as to source of the information reported by the examining provider. In other words the 360 Form did not require the examining provider to state whether the information he or she was reporting derived from Collected Health Information or Clinical Data. This was important because the AWV and physical exam served different purposes. The AWV is a form of preventative health consultation that evaluates the patient based on the patient's self-assessment of his or her health status. The physical exam, on the other hand, is an assessment of health status based on a medical professional's evaluation of clinical signs and symptoms. Findings from the AWV rely on anecdotal evidence of health status, while findings from the physical exam rely on empirical data and clinical analysis.

35.    The Form required the examining provider to report the information indiscriminately and draw conclusions on current health status from the totality of this information. As a result, any diagnoses made from performing the 360s lacked accuracy because

11

the type of evidence upon which the conclusions relied could have been drawn from either source. In fact there are documented instances of misdiagnoses which occurred due to examining providers reaching clinical diagnoses on the basis of anecdotal evidence, and Cigna-HealthSpring was aware that this was happening. An example of one such misdiagnosis is documented in an email exchange attached as **Exhibit A**.

36. Even with chronic illnesses that are considered "permanent," reporting diagnoses on the basis of anecdotal evidence was improper because unless the examining provider has clinical knowledge of prior health conditions the diagnoses are still unreliable because they do not take into account the possibility that the health conditions may have been misdiagnosed or that the patient was stating the wrong diagnoses.

**Performance of the 360s**

37. Cigna-HealthSpring was fully aware that 360s were unreliable when performed by providers unfamiliar with the patient's health history, and for this reason it sought to recruit PCPs to perform them. Cigna-HealthSpring offered PCPs a $150 bonus per completed exam if the PCPs would perform a certain volume of 360s each year for their patients. Those PCPs choosing to participate in the program were also paid $1,000 each time they attended a 360 training seminar held by Cigna-HealthSpring. The purpose of these training seminars was to teach PCPs how to leverage information obtained from the AWV to find high revenue diagnoses.

38. However, despite Cigna-HealthSpring's efforts to recruit PCPs, many PCPs were unable or unwilling to perform the 360s for their patients. Nevertheless, Cigna-HealthSpring, determined to complete as many 360s as possible, attempted to complete the 360s anyway by turning to third party contract providers ("Contract Providers") who could visit the Plan

12

Members in their homes to perform the 360s. For the most part these Contract Providers completed 360s through the use of nurse practitioners ("NPs").

39. Between 2012 and 2017 Cigna-HealthSpring used 6 Contract Providers nationwide to complete 360s. Alegis, being a Cigna affiliate, was the largest Contract Provider by 360 volume. THM was the second largest Contract Provider by volume, and the largest independent Contract Provider. Each year Alegis and THM accounted for approximately 60% of all of the 360s performed for the MA Plan.

40. If and when it became clear that a PCP would not perform a 360 for a patient, Cigna-HealthSpring would add the patient's name and contact information to a "target list" that it compiled and distributed to each Contract Provider based on the market in which the Contract Provider operated. For each Plan Member name that Cigna-HealthSpring distributed, Cigna-HealthSpring also included two .txt files that jointly comprised a document known as a "health management report" ("Historical HMR"). One of these files contained a list of the Plan Member's medications and the date on which they were last reviewed. The second file included a list of diagnoses previously reported to CMS, but did not indicate the date on which these diagnoses were reported.

41. Contract Providers would reach out to Plan Members to schedule the in-home 360s. If a Contract Provider made contact and scheduled the appointment, a NP would be sent to the Plan Member's home and would perform the 360 in accordance with specific instructions provided by Cigna-HealthSpring. The NPs were not permitted to deviate from these instructions.

42. Most Contract Providers performed the 360, completed the 360 Form and then submitted the 360 Form directly to Cigna-HealthSpring for approval. In THM's case, once the 360 Forms were completed they were transmitted to THM's corporate office for processing. The

13

360 Forms were reviewed by "coders" who analyzed the information and then interfaced with the examining NPs to understand the reported conditions and assign ICD Codes to these conditions. This interaction was necessary because in many cases the 360 Forms contained information that was inconsistent and needed correction or ambiguous and required clarification.

43. Once coding was completed, THM summarized the ICD Codes in a report that was intended to supplement the Historical HMR (the "Supplemental HMR"). The Supplemental HMR and the 360 Form were then combined into a single electronic document (the "Comprehensive Form"), a copy of which is attached as **Exhibit B**. Upon completing the Comprehensive Form, a copy was securely transmitted to Cigna-HealthSpring and the Plan Member's PCP.

44. On numerous occasions THM managers made clear to executives at Cigna-HealthSpring that any health conditions and related ICD Codes recorded in the Comprehensive Form were to be used only as a recommendations to the PCPs for review, and that they did not represent confirmed medical diagnoses. This was because the NPs were not physicians, they were not trained to diagnose chronic health conditions, they did not have regular encounters with the Plan Members and they were not furnished with any information regarding the health conditions of the Plan Members other than the limited information in the Historical HMR. THM did not want Cigna-HealthSpring to use any information in the 360 Forms, in particular the ICD Codes, in reporting Risk Adjustment Data to CMS unless and until the PCP approved this information and incorporated the Comprehensive Form, including the Supplemental HMR, into the Plan Member's medical records.

45. In order to avoid misuse of the reported information, each Comprehensive Form included a cover page that instructed the PCP to review the information in the Comprehensive

14

Form before incorporating it into the Plan Member's medical records. The cover page also stated that "[t]he home visit is not a substitute for PCP treatment and DOES NOT replace the annual physical or HMR completed by the PCP."

46. Cigna-HealthSpring's other Contract Providers also provided similar disclaimers on the cover page of the 360 Forms they reported. The cover page to Alegis's form for example states "[t]he visit was solely for the purpose of updating the insurance provider's information regarding the patient and their condition." A representative example of Alegis' 360 Form is attached as **Exhibit C**.

47. In spite of these disclaimers, without confirming that the PCPs had reviewed, approved and incorporated the 360 Forms into the Plan Member's medical records, Cigna-HealthSpring reported the ICD Codes to CMS as Risk Adjustment Data representing the Codes as confirmed medical diagnoses.

<b>The 2017 Arbitration Proceeding</b>

48. Cigna-HealthSpring's misreporting of ICD Codes as well as other misconduct was discovered by the Relator in 2017. In early 2017 THM and Cigna-HealthSpring became embroiled in a contract dispute which ultimately forced THM to seek emergency measures of protection in arbitration with the American Arbitration Association (the "Arbitration"). During an emergency hearing it came to light that HealthSpring had been misusing the information reported by THM and its other Contract Providers in the 360 Forms.

49. Cigna-HealthSpring's Medical Director, Dr. Michael Fessenden, testified under oath that the ICD codes reported by THM did not need to be used because they merely repeated diagnoses described in the 360 Report. He also testified that the reason Cigna-HealthSpring furnished Contract Providers with Historical HMRs was to provide them with a "cheat sheet" to

ensure that the health conditions identified in the Historical HMR were re-validated during the 360 and/or to allow Contract Provider to find new related chronic health conditions.

50.     During the discovery phase of the Arbitration reports were disclosed in which HealthSpring evaluated the performance of each Contract Provider based on "retention rates," or the percentage of chronic health conditions that the providers were able to retain or re-validate during the 360 as compared to the conditions reported in the previous year. HealthSpring set a "goal" of re-validating 85% of all previously-identified chronic conditions by the end of each year.

51.     In addition to the retention rates, these reports set forth the Contract Provider's performance in capturing illnesses in 12 generic disease classes consisting of chronic diagnoses which are "often underdiagnosed." The Contract Provider's results were compared to "all the vendors and to a competitor." If the generic diseases were not identified by the Contract Provider at all during the exams, then Cigna-HealthSpring would flag those underdiagnosed diseases in red, and if there was more than a 3% difference than a competitor, then Cigna-HealthSpring would flag the diseases in yellow. Contract Providers were also evaluated based on the impact of the diagnoses on the Plan Members' risk scores.

52.     It was discovered that Contract Providers with the highest retention rates and risk score increases would be rewarded with additional business volume. Contract Providers with lowest retention rates would be forced to attend educational seminars in which Cigna-HealthSpring employees would provide information on how to re-validate the high value chronic conditions that the Contract Provider previously failed to identify.

## CAUSE OF ACTION

## VIOLATION OF 31 U.S.C. § 3729(a)(1)

53. Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 52 of this Complaint.

54. Under 31 U.S.C. § 3729(a)(1)(A) a person may not knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval by the federal government. In order to comply with this statutory requirement, claims submitted by a MA Organization to CMS for risk adjustments to monthly payments must satisfy the requirements of 42 CFR § 422.310, including the requirement that the sources and extent of submitted data comply with CMS requirements. As a condition to receiving payments, The MA Organization is required to certify the accuracy, completeness and truthfulness of the submitted data. 42 CFR § 422.504(l).

55. Under Section 120.1 of the Medicare Managed Care Manual ("MMCM"), with respect to physicians (including nurse practitioners), only diagnoses "rendered" as a result of a physician visit are relevant data for risk adjustment purposes. Section 40 of the MMCM further provides that all diagnostic codes submitted by a MA Organization "must be documented in the medical record and documented as a result of a face-to-face visit."

56. Since at least as early as 2012, Cigna-HealthSpring has knowingly presented false and fraudulent claims to CMS for payment because the ICD Codes reported in connection with these claims referred to health conditions of Medicare beneficiaries that (1) did not exist, (2) were not documented in any medical records and (3) were not based on clinically reliable information.

17

### Health Conditions that did not Exist

57.     Some of the health conditions represented by the ICD Codes did not represent existing health conditions because they derived from 360 Forms which set forth clinical data that contradicted the diagnoses.  For example in one of the 360 Forms completed by Alegis, new chronic conditions were added for the patient that included dementia and COPD even though the NP noted on the 360 Form that mental and respiratory functions were "normal." Cigna-HealthSpring knew that the information was false because it employed a team of coders and analysts that examined each and every 360 Form for accuracy and internal consistency.

58.     Cigna-HealthSpring also knew or should have known that false health conditions were being reported because it was actively encouraging Contract Providers to falsify diagnoses in 360 Forms.  Cigna-HealthSpring trained providers on ways to render high value diagnoses based on anecdotal evidence collected during the AWV portion of the 360. In educational seminars led by Dr. Fessenden, attendees were taught to "paint a picture" of an adverse condition in the 360 Forms by including notes that could link any signs or symptoms from the physical exam to prior health conditions in the Historical HMR. At one seminar attended by employees of THM, Dr. Fessenden advised attendees that they could diagnose rheumatoid arthritis if they simply noted in their 360 Forms (i) pain in the wrists, proximal interphalangeal joints and metacarpophalangeal joints with morning stiffness lasting more than 1 hour and (2) systemic symptoms of fatigue and weight loss.  These symptoms are common to numerous illnesses.

### Health Conditions that were not Documented in any Medical Records

59.     In addition to the health conditions that did not exist, the vast majority of health conditions reported by Cigna-HealthSpring from Contract Providers were not documented in any medical records as required by Section 40 of MMCM.

18

60.     Other than THM, none of the Contract Providers recorded any ICD Codes in the

360 Forms. Instead, Cigna-HealthSpring extrapolated the ICD Codes from the diagnosis

descriptions. Cigna-HealthSpring in fact generated error reports for submitted 360 Forms in

which it actually instructed providers to remove any ICD Codes from the 360 Forms and to limit

any diagnoses to general descriptions of the relevant health conditions.  By reporting to CMS

ICD Codes that Cigna-HealthSpring, not the examining providers, had generated, Cigna-

HealthSpring violated Section 40 MMCM and misrepresented to CMS that the ICD Codes had

been documented in the assessment form provided by the examining provider.

61.     Cigna-HealthSpring also did not ensure that the health conditions identified in the

360 Forms were documented in the Plan Members' medical records with the PCPs.  As CMS

previously noted:

> The purpose of risk adjustment is to measure health status that is related to plan
> liability. In the case of these assessments, and the identification of risk adjustment
> diagnoses during the assessment, it is not clear that there is plan liability
> associated with the provision of treatment for the conditions identified during the
> assessment. As a result, we are concerned that the apparent significant increase in
> the prevalence of these assessments by MA organizations contributes to increased
> risk scores and differences in coding patterns between MA and FFS. If providers
> are using the results of enrollee risk assessments performed at home to guide
> treatment, then we expect that diagnoses identified during home assessments will
> also be documented in medical records from the follow-up treatment visit(s) in a
> clinical setting.

Advance Notice of Methodological Changes for Calendar Year (CY) 2015 for Medicare

Advantage (MA) Capitation Rates, Part C and Part D Payment Policies and 2015 Call Letter,

dated February 21, 2014 p. 20-21 (available at https://www.cms.gov/Medicare/Health-

Plans/MedicareAdvtgSpecRateStats/Downloads/Advance2015.pdf).

62.     To avoid improper use of the 360 results, in their transmittal of the 360 Forms to

the PCPs, Contract Providers included cover letters with disclaimers to make clear that the 360

Form is not, in and of itself, part of the medical records. In THM's case, every completed Comprehensive Form that was submitted to and reviewed and accepted by Cigna-HealthSpring included a cover page that stated that the Comprehensive Form did not constitute an annual physical exam or replace any historical health records which are completed by a PCP, and it instructed the PCP to review the information before incorporating it into the Plan Member's medical records. The cover page to Alegis' 360 Forms similarly stated that "[t]he visit was solely for the purpose of updating the insurance provider's information regarding the patient and their condition." (see Exhibit C). Cigna-HealthSpring ignored these disclaimers and submitted ICD Codes for hundreds of thousands of encounters without any confirmation that the 360 results had been properly incorporated.

63.     Cigna-HealthSpring submitted these ICD Codes knowing that it was wrong to do so. Dr. Michael Fessenden exchanged emails with HealthSpring employees in which reveal that he was aware that PCPs had not in some cases received copies of the 360 Forms, and he instructed managers to send them months after the 360s were completed so as to avoid any potential accusations of "upcoding" due to the fact that the health conditions reported to CMS did not match the health records maintained by the Plan Member's PCP.

64.     The 360 Forms also do not constitute valid medical records because they were completed by NPs who under applicable law of the state where they were licensed did not have the authority to independently render medical diagnoses. See, Texas Nursing Practice Act § 301.002(2)(stating that the term "professional nursing" does not include act of medical diagnosis). The NPs did not have the authority to render medical diagnoses without collaboration with a physician to confirm that the diagnoses were accurate. Cigna-HealthSpring did inquire as

to the level of authority granted to any of the NPs who performed 360s, nor did they ever confirm that any collaboration occurred.

### Health Conditions that were not Based on Clinically Reliable Information

65. Most if not all of the health conditions reported by Contract Providers and reflected in the ICD Codes were derived from 360 Forms that were not clinically reliable. NPs diagnosed chronic and acute health conditions without conducting any diagnostic tests or obtaining input from any specialists.

66. Instead, NPs rendered clinical diagnoses on the basis of anecdotal evidence. This was due to the way that the 360 Form was designed. The form required that the NPs conduct a review of chronic and acute diseases but only gave them two check-the-box options in completing the review – either (1) diagnose the disease or (2) indicate that there is "no active disease." If a patient disclosed that he or she had a specific condition, then in many cases examining providers diagnosed the condition on the basis of this anecdotal evidence rather than report that there was no active disease. In some cases NPs also rendered diagnoses not based on the Plan Member's statements but rather medications found in the home. This resulted in unreliable diagnoses because none of the 360 Forms indicate the basis on which the NPs rendered their diagnoses (i.e. whether they did so on the basis of anecdotal evidence or clinical data).

67. Cigna-HealthSpring not only knew that the information included in the 360 Forms was unreliable but in fact encouraged providers to use unreliable information such as the Historical HMRs as a guide in finding active diseases year after year. The Historical HMRs provide nothing more than a list of diagnoses previously submitted to CMS without any dates, notes or even the name of the provider who rendered the diagnoses. With regard to

prescriptions, they simply list the names of the medications, dosages and the last date on which they were reviewed. The Historical HMRs clearly are not medical records and they were prepared by Cigna-HealthSpring, not the Plan Member's PCP. They lacked reliability and should not have been relied upon to make a diagnoses.

68.     Cigna-HealthSpring also pushed providers to "recapture" as many chronic health conditions as possible by forcing Contract Providers to compete with each other to attain the highest diagnosis retention rates possible. Those with the highest rates were rewarded with additional business volume, while those with the lowest rates are punished with reduced business volume and they are required to attend educational seminars focused on techniques to increase diagnosis recapture.

69.     To further encourage competition, monthly performance reports were distributed to Contract Providers that highlighted their retention rates as compared to the other Contract Providers, as well as the percentage of diagnoses that were "lost" from the PCPs' medical charts. To keep competition robust, Cigna-HealthSpring ensured that at least two Contract Providers operated in each local market.

70.     Cigna-HealthSpring also entered into contracts with some Contract Providers that paid bonuses for achieving higher retention rates. For example one such provider was contractually entitled to receive Chronic Retention Rate Compensation payment if the provider's annual chronic retention rate were to exceed 80%.

71.     Cigna-HealthSpring also intended to recapture diagnoses by having PCPs use a tool called Lumeris to report all diagnoses so that a list of health conditions could be compiled and provided to the Contract Providers to ensure that all reported diagnoses were re-validated

year to year. Cigna-HealthSpring paid PCPs $250 to record each diagnosis in Lumeris but did not provide them any financial incentives to report any resolved health conditions.

72.     Cigna-HealthSpring's misconduct comes of no surprise.   Cigna-HealthSpring has a longstanding history of regulatory violations, and has received numerous notices of non-compliance, warning letters and corrective actions plans from CMS over the past several years. See CMS Notice of Imposition of Immediate Intermediate Sanctions, dated January 21, 2016, relating to Cigna-HealthSpring's failure to comply with 42 C.F.R. Part 422 and 42 C.F.R. 423. Most recently, on January 21, 2016 Cigna-HealthSpring was sanctioned for failing to abide by CMS compliance program requirements and was stripped of its ability to accept new enrollees in its MA Plan. Id.

73.     Through the acts described above, Defendants knowingly presented to CMS false and fraudulent claims for risk adjustments to its monthly capitated rate. CMS, unaware that these claims were false and fraudulent and relying on the certification provided by the Defendants pursuant to 42 CFR § 422.504(l), paid Defendants amounts that it would not have otherwise paid had it been aware that health conditions of the Plan Members were misrepresented.

74.     Due to Cigna-HealthSpring's conduct, the United States of America, acting through CMS, has overpaid Cigna-HealthSpring on claims deriving from over 375,000 360 encounters, overpayments that on information and belief exceed $1.4 billion in the aggregate.

## PRAYER

WHEREFORE, *qui tam* plaintiff Robert A. Cutler prays for judgment against Defendants as follows:

1.      That Defendants cease and desist from violating 31 U.S.C. §§ 3279-33;

2.      That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' actions in violation of the Federal False Claims Act, as well as a civil penalty of $11,000 for each violation of 31 U.S.C. § 3279;

3.      That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3230(d) of the Federal False Claims Act;

4.      That Relator be awarded all costs and expenses of this action; and

5.      That the United States and Relator receive all such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands trial by jury.

DATED: September 19, 2017                    Respectfully submitted,

By:
Robert A. Cutler
Pro Hac Vice
robertcutleresq@gmail.com
Law Office of Robert A. Cutler
100 Partrick Road
Westport, CT  06880
Tel: (347) 449-0448

# CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of September, 2017, I forwarded the foregoing document via certified mail to the following:

Civil Process Clerk
United States Attorney's Office
Southern District of New York
300 Quarropas Street
White Plains, NY 10601-4150

Lee J. Lofthus
Assistant Attorney General for Administration
U.S. Department of Justice
Justice Management Division
950 Pennsylvania Avenue, NW
Room 1111
Washington, D.C. 20530

Robert A. Cutler
Pro Hac Vice
robertcutleresq@gmail.com
Law Office of Robert A. Cutler
100 Partrick Road
Westport, CT 06880
Tel: (347) 449-0448