IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. | ) | |
| ROBERT A. CUTLER, | ) | |
| | ) | NO. 3:21-cv-00748 |
| Plaintiff, | ) | |
| | ) | JUDGE RICHARDSON |
| v. | ) | |
| | ) | |
| CIGNA CORP. et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Pending before the Court is the United States' Motion to Partially Intervene (Doc. No. 157, "Motion"), which is supported by an accompanying Memorandum of Law (Doc. No. 158, "Government's Memorandum"). Via the Motion, and pursuant to 31 U.S.C. § 3730(c)(3), the United States ("the Government") seeks to intervene as to some of the claims in this False Claims Act case, which were brought by Relator Robert A. Cutler on the Government's behalf—namely, all of Relator's claims as to which it did not expressly decline to intervene by the intervention deadline. Defendants have filed a response opposing the Motion (Doc. No. 161, "Response in Opposition").[1]

In their Response in Opposition, Defendants provide a helpful summary of relevant background information, of Relator's factual allegations, and of the procedural background of the instant case as a whole and of the instant Motion in particular

---

[1] The pagination in the Response in Opposition differs (by a page) from the pagination added by the Clerk's Office ("Page ___ of ___") as part of the pagination process associated with Electronic Case Filing. Herein, the Court endeavors to use the Clerk's Office's pagination rather than Defendants' pagination.

Established by Part C of the Medicare Act, Medicare Advantage ("MA") is a public private program that allows eligible individuals to receive government-subsidized health benefits through private insurance plans. See 42 U.S.C. § 1395w-21 et seq. Under that program, MA organizations ("MAOs") like Cigna contract with the Centers for Medicare and Medicaid Services ("CMS") to manage the care and bear the financial risk for the beneficiaries who enroll in their plans. In exchange, they receive monthly per-member payments, which are adjusted up or down based on members' demographic characteristics and health status relative to the average Medicare beneficiary. Id. § 1395w-23(a)(1). To perform that payment analysis—a process known as "risk adjustment"—CMS requires MAOs to submit diagnostic data from covered medical encounters that a member has with a provider. See 42 C.F.R. § 422.310. This case concerns data from a narrow set of patient encounters as part of Cigna's 360 Program, through which Cigna's MA plan members receive annual comprehensive health risk assessments conducted by their primary care provider ("PCP") in the PCP's office or, less frequently, by nurse practitioners in the patient's home. The Medicare population enrolled in MA plans includes members who are homebound and may not see their PCP in a given year for various reasons, including limited mobility or lack of transportation. In such circumstances, inhome 360 exams may help ensure that members are seen at least once a year by a licensed provider who reviews their medical history and current symptoms, conducts a physical exam, and evaluates their medications and any other information obtained during the visit. Diagnostic data from 360 exams is submitted to CMS. To promote follow-up care from in-home exams, the 360-exam form itself is also sent to the PCP. CMS has long scrutinized diagnostic data from in-home exams and expressly permits MAOs to submit it for risk-adjustment purposes. Well before Relator filed this qui tam action, the same allegations he makes here had been leveled by others against the entire MA industry. See Medicare Payment Advisory Commission, Report to Congress 347-50 (Mar. 2016) (describing concerns that in-home exams are performed by "nurse practitioner[s]" hired by "third-party vendors" "solely as a diagnosis-collection vehicle," including for conditions that "cannot be accurately identified with equipment brought into the patient's home"). In the face of those public allegations, CMS has extensively considered and repeatedly rejected proposals to exclude data from in-home exams for risk-adjustment purposes. To the contrary, it has recognized that such exams "can have significant value as care planning and care coordination tools," and has explained that "[i]n the home setting, the provider has access to more information than is available in a clinical setting." CMS, Announcement of Calendar Year (CY) 2016 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter 145 (April 6, 2015), https://go.cms.gov/3rNlwL9. Indeed, as recently as July 2020, in response to a report highlighting payments for diagnoses of the very conditions at issue from in-home health risk assessments, CMS reiterated that it accepts those diagnoses "for risk adjustment" and that such assessments "are a tool for early identification of

health risks to improve beneficiaries' health outcomes." CMS Comments 38-40, https://oig.hhs.gov/oei/ reports/OEI-03-17-00471.pdf.

On October 2, 2017, Relator filed this qui tam action under seal in the Southern District of New York, and it was assigned to Judge Karas. Dkt. 94. Under the FCA, that triggered the 60-day period for the government to investigate and determine whether to take control of the litigation or allow Relator to prosecute the case on the United States' behalf. See 31 U.S.C. § 3130(b)(2), (4). At that time, Relator was general counsel of a former 360 Program vendor that had initiated a contentious arbitration action against Cigna involving a dispute about contractual payment terms. Relator's Amended Complaint repackages generic concerns CMS has long heard and rejected with respect to in-home exams, asserting three discernable FCA theories: (1) the diagnoses that Cigna reported to CMS for payment were allegedly identified during home visits designed to be "a data-gathering exercise rather than a legitimate medical encounter," where the provider was "prohibited" from "providing medical care"; (2) the diagnoses allegedly were for certain conditions that "could not have been treated or assessed during 360 visits"; and (3) the diagnoses allegedly "lacked medical-record support or otherwise violated CMS coding rules." Dkt. 12, ¶ 47.

The government, then represented only by the U.S. Attorney's Office for the Southern District of New York, was granted more than 26 months' worth of extensions beyond the 60-day statutory period—the better part of two and a half years altogether—to conduct its investigation. During that time, Cigna cooperated fully, producing more than 110,000 documents totaling more than 2.6 million pages. Those materials covered, among other things: Cigna's contracts with its vendors; 360 Program policies, presentations, training materials, and exam forms for use in connection with in-home exams by vendors; documents and communications regarding the Program's structure and design; and communications within Cigna and with vendors regarding the Program. Those productions were made on a rolling basis beginning in October 2018 and were completed by August 2019. In addition, Cigna made three witnesses available for depositions, including a 30(b)(6) representative whom the government deposed in June 2019. Although Cigna scheduled two other employees for requested depositions in September 2019, the government asked to reschedule them for a month later and then, shortly after that request, postponed the remaining depositions indefinitely.

On December 27, 2019, presumably after granting numerous prior extensions, Judge Karas gave the government a final 60-day extension to conclude any necessary investigation. Judge Karas expressly told the government that he would grant "no more extensions" and set a deadline of February 25, 2020 for the government to decide once and for all whether to intervene. On that date, nearly 29 months after Relator filed this case, the government declined to intervene. See Dkt.

13. The FCA provides that the government shall either "proceed with the action" or "notify the court that it declines to take over the action." 31 U.S.C. § 3730(b)(4). Accordingly, the government's Notice stated that it had "decline[d]" Relator's first theory that Cigna violated the FCA by submitting data from "nurse home visits" that "did not involve the provision of medical treatment." Dkt. 13, at 1-2. But as to Relator's remaining "allegations and claims," the government said it had "decided not to intervene at this time."[2] Id. at 2. Following that decision, Judge Karas the same day ordered that the government's Notice and Relator's Amended Complaint be unsealed and served on Cigna so that proceedings between the parties to the case—Relator and Cigna—could move forward. See Dkt. 11. D. Subsequent Proceedings Notwithstanding Judge Karas's February 2020 deadline, the government waited until that very month to issue new document requests and schedule further depositions, including for one that had previously been scheduled for September 2019 before the government postponed it indefinitely. Cigna again cooperated fully: Two individual depositions went forward in May and June 2020, and Cigna completed its further productions by June 26, 2020. After that time, the government did not request additional documents or ask to interview additional witnesses.

Consistent with Judge Karas's practices and the Southern District of New York's local rules, Cigna in the meantime, on September 8 and 15, 2020, filed pre-motion requests to transfer Relator's case to this District and to dismiss Relator's Amended Complaint. See Dkts. 44, 56. A week after Cigna filed the latter request, the government told Cigna it was preparing to make a final intervention decision and asked Cigna to consent to a stay of the litigation as a condition of giving Cigna an opportunity to explain why the government should not intervene. The government and Cigna then jointly sought to adjourn a pre-motion conference, set for October 8, 2020, until December 2020 or January 2021, so that they could "discuss the Government's position as to the remaining claims." Dkt. 64. Judge

---

[2] Defendants dispute the validity of the Government's apparent attempt to distinguish (i) expressly declining to intervene, from (ii) announcing, at the deadline for intervening, a "deci[sion] not to intervene at this time." (Doc. No. 161 at 10). The Court likewise is skeptical of the distinction, believing that Defendants have a point when they assert that the Government legally lacks the option of reserving decision on intervention until after the deadline; the Court can say at least that it does not see how that option (even assuming there is nothing *intrinsically* wrong with exercising it), is treated under the law any differently from expressly declining to intervene. Either way, it appears that the Government must satisfy the good cause standard to intervene later as to claims on which it did not intervene (whether due to express declination or a decision not to intervene by the intervention deadline). The undersigned does not begrudge the Government its apparent attempt, made at the time of the deadline for intervention, to make any potential future late-intervention motion somehow more palatable by signaling that such a motion could be coming *in the future* (even though intervention is not sought "at this time"). But the attempt does not get the Government anywhere in the applicable "good cause" analysis, except insofar as it helps nip in the bud any potential argument by Defendants that they suffered prejudice specifically because they had no reason to believe that the decision not to intervene was not entirely final and that a late-intervention motion conceivably could be coming.

Consistent with these observations, the Court herein generally will refer to what the Government previously did, with respect to the claims as to which it now seeks to intervene, as *declining to intervene* rather than as deciding not to intervene prior to the intervention deadline.

Karas partially granted that request, resetting the conference for November 12, 2020, and stating that "[t]his gives counsel plenty of time to discuss this very old case." Dkt. 65, at 2.

In October 2020, Cigna and the government exchanged presentations conveying their views of the case. Cigna's objective in those discussions was to explain to the government why it should not intervene. The government did not make an initial settlement demand until January 7, 2021, and it did not present its full theory underlying that demand until March 25, 2021. From Yet the government did not intervene prior to transfer. Nor did it intervene prior to December 7, 2021, the date this Court set for an initial case management conference after the case was transferred. Instead, just prior to that conference, the government notified the parties that it intended to ask for a continuance to January 2022 to seek authorization from Main Justice to partially intervene. Cigna objected to that request, explaining that the parties—Relator and Cigna—had already met and conferred regarding the upcoming conference and were in the process of agreeing on a briefing schedule for Cigna's forthcoming motion to dismiss, a motion Cigna had requested leave to file in September 2020. See Dkt. 56. But rather than allow the parties to proceed, the government indicated that it believed it was important to inform the Court that a recommendation regarding intervention had been made to the Civil Division of the Department of Justice, which was still "deciding how to proceed." Dkt. 152, at 1. The Court granted the government's request. Dkt. 154. On January 11, 2022, the government moved to partially intervene on what its motion describes as a "narrower" theory than Relator's—namely, that Cigna violated the FCA by submitting "invalid diagnoses of certain serious medical conditions" made during in-home exams allegedly "without conducting the testing, imaging, or other clinical steps necessary to diagnose those conditions," and where "the beneficiaries did not receive any medical treatment for these conditions from the home visits or from any other medical provider during the year of the home visit." Dkt. 157 at 1. By the time of the government's motion to intervene, this case had been pending more than four years and three months, and nearly two years had passed since the government's election not to intervene in February 2020.

(Doc. No. 161 at 3-9) (footnote added). Except insofar as this summary puts a negative gloss on the actions, inactions, and stances of the Government—a gloss that the Court neither accepts nor rejects at this juncture except as otherwise indicated herein—the Court accepts the summary as accurate and adequate for present purposes.

GENERAL PRINCIPLES CONCERNING INTERVENTION AND LATE INTERVENTION

The False Claims Act, 31 U.S.C. § 3729 *et seq*. ("FCA"), makes liable to the United States any person who engages in any of a number of proscribed acts enumerated in a particular paragraph in the first section of the FCA, including knowingly presenting a false or fraudulent claim for payment or approval and knowingly making or using a false record or statement material to a false or fraudulent claim. *See* 31 U.S.C. § 3729(a)(1). The Government may file against a person a civil action alleging such violations and pursuing such liability. *Id*. § 3730(a). But as relevant here, a private person, known as a relator, also may file a civil action on behalf of the United States. *Id*. § 3730(b)(1). The relator's complaint must be filed in camera and remain under seal for at least 60 days. *Id*. § 3730(b)(2). The 60-day period may be (and quite commonly is) extended by the court upon "good cause shown" by the Government pursuant to a motion for such extension. *Id*. § 3730(b)(3). Prior the expiration of the 60-day period (or any extended deadline prescribed by the court), the Government must either "(A) proceed with the action [and notify the court that it is so doing], in which case the action shall be conducted by the Government [as opposed to the relator]; or (B) notify the court that it declines to take over the action, in which case the [relator] shall have the right to conduct the action." *Id*. § 3730(b)(4). At this time, the complaint is unsealed, and the defendant need not file an answer to the complaint until 20 days after the complaint is unsealed and properly served upon the defendant. *See Id*.§ 3730(b)(2).

If the Government "elects to proceed with the action" (*i.e.*, intervene), then "it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the

[relator]." *Id*.§ 3130(c)(1).[3]   Nevertheless, the relator still "shall have the right to continue as a party to the action, subject to the limitations set forth in [31 U.S.C. § 3730(c)(2)]." *Id.*

If the Government declines to intervene, and the relator proceeds with the action, then "the court, without limiting the status and rights of the [relator], may nevertheless permit the Government to intervene at a later date *upon a showing of good cause*." 31 U.S.C. 3730(c)(3) (emphasis added). It is this provision of the FCA that is specifically implicated by the Motion. The Government claims that the Court should allow it to intervene pursuant to this provision because (according to the Government) "[g]ood cause exists to support the United States' motion to partially intervene in this qui tam action pursuant to 31 U.S.C. § 3730(c)(3)." (Doc. No. 158 at 1). Conversely, Defendants claim that the Motion must be denied because "[t]he government's request does not satisfy the FCA's 'good cause' standard for belated intervention." (Doc. No. 161 at 2).

Naturally, this raises the question of what this standard entails. As each side notes, (Doc. Nos. 158 at 8, 161 at 9,), "good cause" is not defined by the FCA. And each side embraces the view of this standard espoused by *United States ex rel. Ross v. Indep. Health Corp.*, No. 12-CV-299S, 2021 WL 3492917, at *2 (W.D.N.Y. Aug. 9, 2021). As each side further notes, (Doc. Nos. 158 at 8, 161 at 9), *Indep. Health* (and the case it quotes, *Griffith v. Conn*, NO. 11-157-ART-EBA, 2016 WL 3156497 (E.D. Ky. Apr. 22, 2016)) describes the good-cause standard as "'requir[ing] balancing the government's justifications for an untimely intervention against any possible prejudice to the relators and defendants caused by such intervention.'" *Indep. Health*, No. 1:12-

---

[3] If the Government does intervene, then it "may file its own complaint or amend the complaint of [the relator] to clarify or add detail to the claims in which the Government is intervening and to add any additional claims with respect to which the Government contends it is entitled to relief." 31 U.S.C. § 3731(c). Here, the Government indicates that it would indeed file its own complaint (a complaint known in this context as a "complaint in intervention"). (Doc. No. 157 at 1). It is unclear to the Court whether the Government anticipates including any additional claim (claims beyond those of Relator as to which it previously declined intervention) in its contemplated complaint in intervention, or whether instead the complaint in intervention would be based solely on claims of Relator as to which it previously declined intervention.

cv-299, 2021 WL 3492917, at *2 (quoting *Griffith,* 2016 WL 3156497, at *3).[4] And as the Government notes, (Doc. No. 158 at 8), *Indep. Health* sets forth three factors to consider when conducting this balancing: "(1) whether intervention would be in the public interest, (2) whether new, probative evidence has been discovered, particularly as to the magnitude of the fraud, and (3) whether intervention would unfairly prejudice the relator or the defendant." *Indep. Health*, 2021 WL 3492917, at *2 (citations omitted).

The undersigned here will reiterate what he has said previously about multi-factor tests generally:

> "The undersigned has noted on multiple occasions that multi-factor (or balancing) tests, though often having considerable desirability and merit, tend to foster outcomes that are unpredictable on the front end, given such tests' subjectivity." *Memphis A. Phillip Randolph Inst. v. Hargett*, 482 F.Supp.3d 673, 696, (M.D. Tenn. 2020) (quoting Eli J. Richardson, *Eliminating the Limitations of Limitations Law*, 29 Ariz. St. L.J. 1015, 1050 (1997) (proposing a multi-factor test to resolve civil limitations issues, while conceding that when courts "apply[ ] a multi-factor test, [it is] always an unpredictable endeavor") and Eli J. Richardson, *Taking Issue with Issue Preclusion: Reinventing Collateral Estoppel*, 65 Miss. L.J. 41, 95 (1995) (proposing multi-factor test to resolve collateral estoppel issues, while conceding that its drawback is that it "would produce unpredictable resolutions of collateral estoppel issues, in that it is so flexible and calls for very subjective judicial determinations")).

*Acosta v. Peregrino*, No. 3:17-cv-01381, 2020 WL 5995049, at *6 (M.D. Tenn. Oct. 9, 2020). The undersigned believes that at least some room for legitimate disagreement exists with respect to the proper result of the outcome of the multi-factor test to be employed here. But he must call it like he sees it after weighing each factor in turn. After so doing below, he is confident that he has reached a sound result, even if it is not indisputably "correct" in the manner of, say, the answer to an algebraic or arithmetic problem.

---

[4] As discussed below, Defendants claim that in addition to this balancing test, the standard involves a particular threshold requirement that the Government must satisfy in order to show cause, but the Court rejects that claim.

<u>SUMMARY OF THE PARTIES' COMPETING POSITIONS</u>

At its outset, the Government's Memorandum summarizes the Government's argument for why it should be allowed to partially intervene in this case:

> Good cause exists to support the United States' motion to partially intervene in this qui tam action pursuant to 31 U.S.C. § 3730(c)(3). Since February 2020, when the government notified the District Court for the Southern District of New York it had made no decision on whether to intervene on certain claims, the government has continued to investigate this matter—including by obtaining new, probative evidence—and engaged in extensive, but ultimately unsuccessful, settlement discussions with Defendants (defined below). Now that the case will proceed in litigation, intervention is in the public interest: if the government intervenes, it will be able to employ its resources and expertise to ensure the recovery of millions of dollars obtained fraudulently from the Medicare Advantage Program, also known as Medicare Part C. Intervention will not prejudice any party: Relator, whose interests the good cause standard protects, consents to the motion. And, because the case is in a very early stage, intervention will not prejudice the Defendants: they have not yet answered the Relator's Complaint, and no discovery has been taken by any party.

(Doc. No. 158 at 1).   On the other hand, Defendants summarize their position as follows:

> Judge Kenneth M. Karas—after granting more than two years of extensions—set a final intervention deadline of February 25, 2020, at which time the government declined to intervene. Now it seeks to intervene without presenting any evidence that was unavailable to the government during its investigation of Relator's claims over the 29 months prior to its declination. The government's request does not satisfy the FCA's "good cause" standard for belated intervention.

(Doc. No. 161 at 1).

<u>ANALYSIS</u>

I.   <u>The post-declination discovery of "new and significant evidence," though potentially relevant to the applicable balancing test as to "good cause," is not a requirement for a showing of good cause.</u>

As discussed above, Defendants note that the good-cause standard is governed by a multi-factor balancing test. But in multiple places, Defendants also suggest that the standard involves—in addition to *factors to be balanced*—a specific *requirement* that the Government must satisfy. It is certainly possible for a particular standard to involve *both* a threshold requirement that a movant

must satisfy and (if the threshold requirement is satisfied) the balancing of factors. This is, for example, true in the case of a motion for a temporary restraining order or preliminary injunction; to prevail, the movant must show irreparable harm in the absence of the requested relief (as a *requirement* to be satisfied) and—if the movant succeeds in doing so—then must prevail under the balancing of four factors (including the irreparable harm already found to exist). *See, e.g., STAR Teams, Inc. v. Transplant Advocs., LLC*, No. 2:22-CV-00022, 2022 WL 2161043, at *3 (M.D. Tenn. June 15, 2022) (citing, inter alia, *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019)). But that does not necessarily mean that the standard at issue here involves such a threshold requirement.

In multiple places in its Response in Opposition, Defendants posit the existence of such a requirement. They claim that "courts have repeatedly held that the government must show, at a minimum, 'new and significant evidence … which escalates the magnitude or complexity of the fraud and causes it to reevaluate the decision not to intervene.'"[5] (Doc. No. 161 at 8) (quoting *United States v. Se. Eye Specialists, PLLC*, No. 3:17-CV-00689, 2020 WL 4431464, at *4 (M.D. Tenn. July 31, 2020), *report and recommendation vacated*, No. 3:17-CV-00689, 2021 WL 790889 (M.D. Tenn. Feb. 24, 2021), *appeal dismissed sub nom. United States v. SouthEast Eye Specialists, PLLC*, No. 21-5332, 2021 WL 2769220 (6th Cir. May 7, 2021)). For this proposition—*i.e.*, that the Government *must* show "new and significant evidence" having the specified effect—

---

[5] Defendants elsewhere likewise characterize this kind of "new and significant evidence" as a requirement, when they state that "Congress amended the FCA in 1986 to permit late intervention for good cause where, *at a minimum*, the government presents 'new and significant evidence' discovered after it decided not to intervene that 'escalates the magnitude and or complexity of the fraud' and causes it to 'reevaluate its initial assessment.'" (Doc. No. 161 at 2) (emphasis added). As just indicated (via the placement of three sets of internal quotation marks within the quotation marks), Defendants here placed three phrases in quotation marks, without any citation to what Defendants were quoting here. The Court gathers from later in Defendants' Response in Opposition that these phrases come from *Se. Eye Specialists*. But given how the quoted sentence began, one naturally would think that Defendants there were *quoting Congress—i.e.*, the applicable federal statute passed by Congress. But in fact, the applicable federal statute does not contain any of the phrases Defendants placed in quotation marks. This is misleading, whether intentionally or unintentionally so. Counsel should avoid doing likewise in the future.

Defendants do not cite any authority other than just-referenced report and recommendation authored by a magistrate judge of this Court. This is problematic for Defendants, and not merely because this particular report and recommendation (though authored by a notably learned jurist) was vacated or because a report and recommendation is not binding on the undersigned in any event. The report and recommendation is not even persuasive on the proposition for which Defendants cite it, because it arguably does not even express—and certainly does not even undertake to support—that proposition. In pertinent part, the report and recommendation states:

> Courts first examine whether the Government has shown that "'new and significant evidence is found' which 'escalates the magnitude or complexity of the fraud'" and causes it to reevaluate the decision not to intervene. [*United States ex rel. Hall v. Schwartzman*, 887 F. Supp. 60, 62 (E.D.N.Y. 1995)] (quoting S. Rep. No. 99-345, at 26–27 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5291–92); [*United States v. Aseracare*, No. 2:12-cv-245-KOB, 2012 WL 5289475, at *1 (N.D. Ala. Sept. 24, 2012)].. Once the Government has asserted the discovery of new information supporting intervention, courts generally do not closely examine the nature of the newly discovered evidence or whether the information was available to the Government when it initially decided not to intervene.

*Id.* As for the last sentence here, it seems to assume a scenario in which the Government had asserted new and significant evidence, but it does not state that the Government was required to make such a showing. And as for first sentence here, to say that courts "examine whether" the Government has made a particular showing is not to say that they *require* that showing. In any event, the internal citations here do not support the notion that courts require a showing of this kind of "new and significant evidence." *Hall* and *Aseracare* did *examine whether* the Government had made such a showing, clearly believing that such a showing would strengthen the Government's position, but neither court purported to *require* such a showing.

As for the cited Senate Report, upon which Defendants expressly rely in asserting that new and significant evidence is a requirement (Doc. No. 161 at 18), it concerns the statutory amendment (included in the 1986 amendments to the FCA) that added the applicable provision of 31 U.S.C. §

3730(c)(3) allowing for late intervention. Of course, a report preceding the legislative enactment of a particular standard (here, the good-cause standard for late intervention) is of no value in establishing what "courts *have repeatedly held*," (Doc. No. 161 at 18) (emphasis added), regarding that standard. Nor does this senate report even suggest that courts *should* hold that new and significant evidence be required for late intervention. It states, in pertinent part:

> Under current law, the Government is barred from reentering the litigation once it has declined to intervene during this initial period. The Committee recognizes that this limited opportunity for Government involvement could in some cases work to the detriment of the Government's interests. Conceivably, new evidence discovered after the first 60 days of the litigation could escalate the magnitude or complexity of the fraud, causing the Government to reevaluate its initial assessment or making it difficult for the *qui tam* relator to litigate alone. In those situations where new and significant evidence is found and the Government can show 'good cause' for intervening, [the applicable provision currently codified at 31 U.S.C. § 3730(c)(3) provides that the court may allow the Government to take over the suit..

S. REP. 99-345, 26-27, 1986 U.S.C.C.A.N. 5266, 5291-92. The report here states that (assuming the Government can show "good cause") late intervention is appropriate in—as opposed to *only in*—those situations where new and significant evidence is found; it thus suggests that (where the Government can show good cause) the presence of such evidence is sufficient but not necessarily required.

Moreover, as the Government notes, "had Congress meant to impose a specific evidentiary requirement for intervention, it would have done so. It did not." (Doc. No. 166 at 3). The Government cites *Griffith v. Conn*, No. 11-157-ART-EBA, 2016 WL 3156497 (E.D. Ky. Apr. 22, 2016) for the proposition that "[c]ourts may use legislative history only to help clarify the meaning of unclear or ambiguous terms in statutes, not to add new words or requirements into a statute." *Id.*, at *2 n.1 (citing *Brilliance Audio, Inc. v. Haights Cross Communs., Inc.*, 474 F.3d 365, 371–72 (6th Cir. 2007)). The undersigned agrees entirely. So even if the Court did believe that this language from the senate report purported to announce a requirement of new and significant

evidence, the Court still would decline to read that requirement into the statute based on a single phrase in a senate report.

Moreover, the applicable phrase refers to the existence (or non-existence) of new and significant evidence not *as relevant to the inquiry into the existence of good cause*, but rather as a consideration into the appropriateness of late intervention *separate from the existence of good cause*. So the language from the get-go fails to support the notion that new and significant evidence is required for a finding of "good cause"; even if the language about new and significant evidence were somehow mandatory, it would at most support the notion that new and significant evidence is a requirement *separate from* good cause.[6] And the undersigned declines to recognize a requirement *separate from* good cause—just as he has declined, above, to recognize a requirement *for a finding of* good cause—where Congress prescribed no such requirement in the legislation it passed.

In conclusion, a showing of good cause does not require the Government to show post-declination discovery of "new and significant evidence," let alone new and significant evidence that has the particular effects mentioned by the defendant (escalating the magnitude of the fraud and causing the Government to re-evaluate its initial assessment). True, such a showing (or the lack thereof) can be considered in the multi-factor balancing test embraced by both sides here. *See, e.g.*, *United States ex rel. Capshaw v. White*, No. 3:12-CV-4457-N, 2017 WL 11511289, at *1 (N.D. Tex. Apr. 25, 2017) ("Good cause may include a showing of changed circumstances, the discovery of additional information, or a variety of other factors."). But such a showing is not a

---

[6] The Court understands that if there were a requirement of new and significant evidence, then it logically could be considered a requirement subsumed in the good-cause language. And it may be illogical to think of new and significant evidence as a consideration separate from good cause. But the fact remains that the language at issue here suggests, even if illogically, that new and significant evidence is a consideration separate from good cause.

*requirement* for a motion for late intervention to survive to the point of the balancing test. Instead, the Court begins (and ends) with that balancing test.

II.    Under the applicable balancing test, the Government has shown as required "good cause" for late intervention.

Relegated to prevailing under the applicable balancing test, and not by virtue of a (non-existent) requirement of new and significant evidence, Defendants are at a disadvantage. The Government asserts that the good-cause standard is notably lenient (for the Government). (Doc. No. 166 at 1). The Government does not cite any cases for the proposition that the standard is "lenient," or "not demanding," or anything else along those lines, and the Court was unable to find any on its own. But the Court does not dispute that courts in practice have applied the balancing test "leniently" as that term is commonly understood, inasmuch as the Court credits the Government's assertion (*id.* at 2 & n.1) that motions for late intervention are virtually never denied, with Chief Judge Crenshaw's decision in *S.e. Eye Specialists* being the only identified exception.[7] Lenient or not, the applicable test nevertheless ultimately requires the Court to determine whether the competing interests truly at issue weigh in favor of intervention.

The Western District of New York has summarized the determination as whether the Government's reasons for (late) intervention outweigh any prejudice to the other parties, namely the relator or the defendants. *See Indep. Health*, 2021 WL 3492917, at *4. The determination also involves consideration of the public interest (to the extent that it is distinguishable from the *Government's* interest).[8] So the Court views the determination as whether (i) the Government's

---

[7] Though the decision in *S.e. Eye Specialists* appears to be an outlier in that it denied late intervention, the undersigned does not mean to suggest that it was wrongly decided. And rather than engage in a comparative analysis of the facts and legal reasoning in this case vis-à-vis the non-precedential decision in *S.e. Eye Specialists*, the undersigned will focus solely on the instant case.

[8] In some contexts, courts view the public's interest as identical to the Government's interest, such that there is no real distinction. For example, for purposes of the multi-factor balancing test applicable to requests for a temporary

reasons for late intervention *plus* any separate interests of the public favoring intervention outweigh (ii) any prejudice to the relator, any prejudice to Defendants, *and* any separate interests of the public militating against late intervention.[9] But here, Defendants do not seem to assert any such separate public interest, and the Court does not discern any. Accordingly, in this case the balancing is between the Government's reasons for late intervention on the one hand and prejudice to Relator or Defendants on the other hand.

Significantly, the balancing involves the Government's *reasons for (late) intervention*—meaning in particular, it seems clear, the Government's interest in intervening as of whatever (late) date it seeks to intervene.[10] It does not involve the Government's *reasons for intervening late* (*i.e.*, reasons for intervening specifically at a later date, after declining to intervene). Relatedly, the Court agrees with the Government (except as indicated in the next sentence) that the applicable inquiry does not "necessitate an inquiry into whether the government might have obtained

---

[9] restraining order (or preliminary injunction), "when the government opposes the issuance of [the] temporary restraining order because the government's interest is the public interest." *Hartman v. Acton*, No. 2:20-CV-1952, 2020 WL 1932896, at *11 (S.D. Ohio Apr. 21, 2020) (internal quotation marks omitted). *See also, e.g.*, *Pursuing America's Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 512 (D.C. Cir. 2016). Of course, this makes sense, inasmuch as the Government is at least supposed to represent the public interest. Naturally, in any particular context, one might question whether the particular government officials making decisions or policy truly have the public interest at heart. But nevertheless, given the federal government's role in our republic, the Court must be given a good reason to distinguish between the Government's interests and the public's interest (for example, a substantial claim that the government officials involved have truly "gone rogue"). But as noted above, the Court perceives of no such reason in this case.

[9] Courts are not always consistent, even internally as to whether the applicable consideration is prejudice, or instead the broader consideration of "possible prejudice." *Compare, e.g.*, *Indep. Health*, 2021 WL 3492917, at *2 (referring to "possible prejudice") *with id.* at *4 (referring to "prejudice"). Below the Court will use the term "prejudice," believing that the distinction is not relevant here *even if* mere "possible" prejudice (not amounting to actual prejudice) can militate against late intervention, because Defendants have not established any "possible prejudice" just as they have not established any actual prejudice. The problem for Defendants is not that the circumstances they have pointed to as "prejudice" are only *possible* circumstances; the problem is that the circumstances it has pointed to as prejudice are not cognizable as prejudice—be it actual prejudice or merely "possible" prejudice—in this context. Indeed, the Court does not see where Defendants even attempt to establish any "possible" prejudice separate from actual prejudice.

[10] That this is the applicable meaning is reflected in the extant case law applying the balancing test. It is also, on balance, more consistent with the words of the statute authorizing requests for late intervention, which allows the Court to "permit the Government to intervene at a later date upon a showing of good cause." 31 U.S.C. § 3130(c)(3). This language suggests more that the required good cause is good cause *for intervening (albeit at a later date)* than that the required good cause is good cause *for intervening at a later date rather than an earlier (pre-deadline) date*.

evidence more quickly or intervened [prior to the deadline for intervention], as Defendants contend."[11] (Doc. No. 166 at 4) (citing *Indep. Health*, 2021 WL 3492917 at *3, 6). The Court notes, however, that it is appropriate to consider whether the Government could have moved to intervene more quickly *after declining intervention* than it actually did; the Government concedes that the Court can consider the gap between the Government declining intervention and the Government moving thereafter for leave for late intervention. (*Id.*). That gap spans just under two years in the instant case.

The Government relies on its interest in enforcing the FCA as a general matter. It relies also on the related and somewhat more specific interest in enforcing the FCA in connection with fraud on the (publicly funded) Medicare program in particular. There is no question that these are important interests. But Defendants have a point when they argue essentially that this sort of generalized enforcement interest by itself cannot establish good cause, because otherwise good cause would exist as to every motion for late intervention in an FCA case, thus turning the good-cause standard into a mere rubber stamp. (Doc. No. 161 at 19). The Court agrees; the Government does not satisfy the good-cause standard if its sole interest is a mere generalized interest in enforcing the FCA (or enforcing the FCA with respect to particular kinds of conduct allegedly in violation of the FCA). To hold otherwise would be to make the good-cause standard illusory, *i.e.*, effectively no standard at all.

But contrary to Defendants' implication, the Government's interest here is based not merely on the fact that the instant case is one to enforce the FCA (in the specific context of alleged

---

[11] The Government used the word "earlier" in the place where the Court has inserted text in brackets. The brackets much more precisely reflect the Government's meaning here, because very shortly after this very quote, the Government acknowledged that it *was* appropriate to ask whether the Government could have intervened *earlier* so long as that question was aimed only at the gap between the declination of intervention and the filing of the motion for late intervention rather than at the larger gap between Relator's filing of the action and the filing of the motion for late intervention.

fraud on Medicare). The instant case is one in which the Government has itself conducted substantial investigation (both before and after the original declination of intervention), including expert analysis of records produced by Defendants. (*Id.* at 3-4; Doc. No. 158 at 4-5). With these resources expended, the Government has the metaphorical skin in the game in this case—and the specific claims in this case as to which it seeks to intervene late—that gives it an interest in this case that go well beyond a mere generic interest in enforcing the FCA via intervention in FCA cases generally. The Government's interest (and specifically its increased *post-declination* interest) in this case in particular is based additionally on the fact that, according to the Government, its continuing investigation did develop new, probative evidence after February 2020. Again according to the Government, the new information, and expert analysis of some of it, "will help support the allegations in the government's [anticipated] complaint in intervention," in part because some of it showed that "certain conditions [of Cigna beneficiaries] were diagnosed without necessary testing or equipment." (Doc. No. 166 at 4). All of which is to say that, according to the Government, investigation (including post-declination) investigation by the Government shows that Relator's claims at issue are not merely of *generalized* interest because they involve alleged FCA violations, but rather are of *specific* interest because the Government has determined (through significant effort) that they are substantively meritorious. And the Government's interest in investigating claims that strike it as meritorious is far weightier than the mere generic interest Defendants inaccurately claim is all the Government has here.

Relatedly, in asserting that its development and evaluation of the newly obtained information continued long past its declination of intervention, the Government has gone a long way to explain why it waited almost two years after declination to move to intervene as to Relator's remaining claims. And the Government further justifies a great deal of the rest of the delay by

stating that it engaged with Defendants between fall of 2020 and October 2021 in good-faith settlement discussions (which could have obviated any need to intervene),[12] that Defendants retained new counsel during the spring of 2021, and that this case was transferred to this Court from Southern District of New Yok in September 2021. Each of these events helps justify a delay in moving to intervene late, and collectively they explain the reason why late intervention reasonably would not have been sought until October 2021 at the earliest.

Defendants urged the Court to reject the Government's assertions as to the value of the evidence obtained post-declination, urging the Court not to accept those assertions based solely on the Government's "say-so." (Doc. No. 161 at 11). The Court realizes that the Government's assertions in this regard are self-serving, not evidential (in that they are not sworn or verified in any way), and subjective inasmuch any assessment of the value or proper weight evidence is to an extent (and within reason) inherently in the eye of the beholder. So the Court does not begrudge Defendants their concerns here. However, the Government is right that now is not an appropriate juncture for the Court to do an assessment of the weight of particular (post-intervention) evidence; such an assessment now would put the cart before the horse and appears in the undersigned's view to be an undertaking likely much more involved than should be required to determine the existence or non-existence of good cause to file something (like claims in intervention). Second, although the Government's assertions in its briefing lack the formality and the threat of perjury associated with an affidavit or declaration from counsel, the Court believes it certainly has the discretion to accept as true the factual assertions made in briefing by counsel. As for Government counsel's subjective characterization of information newly received post-declination as significant and

_____

[12] With admirable candor, Defendants concedes that the time period in which negotiations were held should not be counted as delay. (Doc. No. 161 at 13). Defendants describe the period as spanning from January 2021 until September 2021 rather than approximately one year as asserted by the Government. Even accepting the time period as being the shorter one posited by Defendants, it amounts to nearly 40 percent of the period of delay (nearly 24 months) at issue.

helpful to its case, the Court believes it has the same discretion. The Court's belief is enhanced by its unawareness of any authority conflicting with that belief, by the fact that Government counsel is in a position to draw conclusions on this point (albeit, as noted, subjective conclusions), by the fact that Government counsel has ethical obligations as officers of the Court and substantial disincentives to knowingly or recklessly state or mischaracterize facts, and by the Court's lack of particular reasons to believe that Government counsel's statements and characterizations of facts are false or even dubious.

For all of these reasons, the Court concludes that the Government has established a substantial and case-specific interest in late (partial) intervention and an explanation for the length of the (post-declination) delay in seeking to intervene as to the claims at issue.

The Court then assesses any countervailing prejudice to other parties. Unsurprisingly, Relator supports the Motion. (Doc. No. 157 at 2). This, plus the reality (which almost goes without saying) that relators can benefit very substantially from the Government's decision to expend its own resources handling the litigation, leaves the Court with no doubt that partial intervention would not prejudice Relator in the least. That therefore leaves, as the only counterweight to the Government's asserted interest, any prejudice to Defendants. As Defendants correctly note, even if a relator consents to late intervention, prejudice to the defendant(s) potentially can be sufficient to deny late intervention.

Defendants rely on the proposition that "that lengthy and unexcused delays in prosecuting a claim prejudice a defendant's 'ability to defend [itself] as the events recede further into the past and evidence becomes more stale.'" (Doc. No. 161 at 15) (quoting *U.S. ex rel. Pervez v. Maimonides Med. Ctr.*, No. 1:06-cv-4989, 2010 WL 890236, at *3 (S.D.N.Y. Mar. 9, 2010)). This proposition is unassailable, but it fails to move the needle for Defendants, for several reasons. First,

as stated, it is simply inapplicable because, although the applicable (roughly) 24-month delay here may be called "lengthy," for the reasons stated above the delay is not "unexcused." Second, although the Court realizes that delays can disadvantage a defendant even if they are *not* unexcused, they just as easily can disadvantage the Government. It is not only the defendant that has to deal with the fading of witnesses' memories (or any other form of increasing staleness of evidence);[13] the Government must do likewise, and the existence of this challenge actually can be more problematic for the Government than for the defendant, since the Government has the burden of proof.

The Court perceives an additional problem with Defendants' reliance on the quoted proposition. Defendants presumptively will have to defend themselves against the claims as to which the Government seeks to intervene, *whether or not* the Government is permitted to intervene. The Government seeks to intervene, of course, only with respect to (some of the) claims already brought by Relator.[14] (Doc. No. 157 at 1). Those claims would remain pending, for Relator to continue to pursue at his option, even if the Government is not permitted to intervene after previously having declined to do so. *See* 31 U.S.C. § 3730(b)(4) (noting that if the Government declines to intervene, "the [relator] shall have the right to conduct the action."). So denying the Motion would not serve to save Defendants from defending against claims that are on the old side and getting older. What such a denial would do, instead, is merely change—from Relator and his counsel to the Government and its counsel—who exactly Defendants would be contending with in litigation involving those claims.

---

[13] The Court has to ask whether, and in what sense, evidence can become "stale"—a term of unclear meaning in this context, which does not involve, say, a cracker or a potato chip—other than via the fading of witnesses' memories.

[14] As noted above, *if* the Government is allowed to intervene, it may present additional claims not asserted by Relator. But the possibility of additional claims that go beyond the specific ones as to which intervention is sought does not change the fact that the Government seeks to intervene only as to particular claims of Relator (those as to which the Government did not expressly state that it had specifically declined to intervene).

Of course, this may be undesirable from the perspective of Defendants, given the additional expertise and resources the Government might bring to bear in this litigation. But such the fact that it is *undesirable* does not make it *prejudicial* in the sense applicable here. In the present context (as in so many others, such as Federal Rule of Evidence 403), "prejudice" in this context actually means, more precisely, *unfair* prejudice. *See Griffith*, 2016 WL 3156497, at *3 ("[T]he purpose of the 'good cause' requirement for late intervention must be to provide protection to relators and defendants from *unfair* prejudice due to an untimely intervention from the government.") (emphasis added). Granting the Government permission to take over the litigation of some claims may visit "prejudice"—a disadvantage—upon Defendants in the form of increased difficulty in defending those claims inasmuch as the Government is a uniquely formidable opposing litigant. And the Court does not begrudge Defendants their strong desire to avoid this sort of prejudice. But the Court does not see how any such "prejudice" would be *unfair* prejudice. The Court sees nothing unfair about having claims—especially claims against Defendants that presumably have their own formidable array of resources, including experienced and qualified counsel—prosecuted by a litigant that is especially well suited for the task. In fact, this scenario well may increase the possibility that a decision on the merits is based on exactly that—the merits—and not on a lack of resources or expertise on the part of one side or the other.[15] And there is nothing unfair about enhancing the likelihood of a merits-based decision. Perhaps more to the point, Congress certainly saw nothing unfair about having the Government litigate FCA cases against the Government; Congress prescribed that the Government at its option may do exactly that, and so Defendants

---

[15] The Court does not mean to suggest that Relator's counsel lacks adequate resources or expertise; its point, instead, is that any possibility of the plaintiff's side suffering from a lack of resources and expertise tends to be minimized if the Government is handling the litigation from the plaintiff's side.

must explain what it is about late intervention in this case that would make this generally fair development unfair in this case.

Attempting further to do so, Defendants rely on what they characterize as "the prejudice that has *already* occurred from the government's failure to swiftly decide whether to intervene[,]" specifically, the Government's "thwart[ing] of Cigna's efforts to move the case forward at every turn in order to buy itself more time to make an intervention decision." (Doc. No. 161 at 16) (emphasis added). Even if the Court could rely on prejudice *already* visited upon Defendants, as discussed above the Court would be looking for *unfair* prejudice, and on the current record the Court cannot find that—despite Defendants' use of a term to describe the Government's tactics and the results thereof ("thwart") that tends to conjure up images of unfairness. And in any event, the Court does not perceive that it can rely on the prejudice supposedly *already* visited upon it by the delays. Defendants cite no authority for the proposition that such is properly considered by the Court. And as the Government suggest, (Doc. No. 166 at 5), the applicable balancing test is indeed forward-looking; it assesses what if any (unfair) prejudice would be visited upon Defendants *in the future* if intervention was permitted at this time; the focus is upon what unfair prejudice *intervention* would cause, not what prejudice *prior delays* have already caused. True, the existence and extent of any such "forward-looking" prejudice conceivably can turn in part on what has happened in the past. But the question is what (unfair) prejudice would ensue in the future from intervention, albeit considering all relevant considerations (including, conceivably, any prior delays).

And try as it might, the Court cannot perceive how any future prejudice *from intervention* is enhanced by prior delays. As the Government notes, Relator could continue to prosecute these

claims even if the Government is not permitted to intervene.[16] (Doc. No. 166 at 5). Prior delays (which in any event have not been shown to be the result of improper tactics by the Government) may hurt Defendants in various ways, but as noted above such delays likewise may hurt the plaintiff side here. Even more to the point, the harm will exist whether or not the Government takes the reigns from Relator on the plaintiff side; either way, the pending FCA claims subject to discovery, expense, uncertain, and reputational impact even in the absence of intervention.

Finally, Defendants assert that allowing late intervention would run counter to the will of Congress here. But late intervention in this (or any other) instance would undermine congressional intention only if the Government has not met the good-cause standard. So Defendants merely beg the question this assertion purportedly is meant to answer: whether the good-cause standard has been met.

For its part, the Government asserts that an absence of prejudice is suggested by the fact that this case is in the early stage, prior to the filing of any motions to dismiss or the taking of any discovery. (Doc. Nos. 158 at 1; 166 at 6). This assertion actually is of limited value, for the very reason the Government itself has suggested: this case is in whatever state it is now in, and this case will go from there irrespective of who is controlling the litigation on the plaintiff's side. But the assertion is at least minimally relevant, as it eliminates the possibility that Defendants will have to expend resources and change strategy on the fly, as to motions to dismiss and discovery already in the works, due specifically to a change in the identity (and motion-practice and discovery strategy and tactics) of their litigating adversary.

---

[16] Of course, especially if he was really counting on the Government intervening, Relator could seek to dismiss this case if the Government were not permitted to intervene. But any such dismissal is speculative, and the Court declines to afford any weight to such speculation, choosing instead to proceed under the current reality that FCA claims are pending against Defendants and will be so pending until further notice.

For all of these reasons, the Court finds little or nothing that counts under applicable law as cognizable prejudice. And thus the Government's above-identified interests outweigh cognizable prejudice to Defendants.

<u>CONCLUSION</u>

The Court certainly understands Defendants' apparent frustration in the delays and litigation in this case, understanding that Defendants are naturally not happy about the reputational and financial fallout from being sued for alleged FCA violations, about the prospect of litigating against the Government, or about the nearly two-year hiatus before the Government moved to intervene as to certain of Relator's claims. One can imagine a statutory scheme that would flat-out prohibit this kind of late intervention or, failing that, at least a test for good cause that would account more for Defendants' frustrations. But frustrating though it may be for Defendants, late intervention is allowed under the law so long as the Government can satisfy the good-cause standard.

As the Court perceives the good-cause standard that it must apply, the standard does not account for the kinds of things Defendants find frustrating (including the fact that the Government supposedly could have done certain things earlier than it actually did them), and instead focuses on *any unfair disadvantages* that Defendants would face from the Government rather than Relator taking the lead on the plaintiff's side. The Court can find no such disadvantages. And the good-cause standard does not require a showing of "new and significant evidence" as claimed by Defendants, and to the extent such evidence is relevant or even required, the Court is satisfied that it has been established here.

Ultimately, balancing the interests that are properly considered in determining the existence of good cause, the Court finds that the balance favors the Government. Therefore,

although the standard for resolving this kind of Motion theoretically could be different, the standard as it is has been satisfied by the Government. Accordingly, the Motion (Doc. No. 157) will be GRANTED.

An appropriate order will be entered.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE